**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| MICHAEL PROEBSTLE, as Personal Representative of the Estate of Richard Proebstle, individually and on behalf of all similarly situated individuals,<br><br>*Plaintiff,*<br><br>*v.*<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>*Defendant.* | Case No. 1:19-cv-1791<br><br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

<u>**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiff Michael Proebstle, as Personal Representative of the Estate of Richard J. Proebstle, deceased, and on behalf of all others similarly situated, brings this Complaint and Demand for Jury Trial against Defendant National Collegiate Athletic Association ("NCAA") to obtain redress for the wrongful death of Richard Proebstle, who was injured, incapacitated, and died as a result of Defendant's reckless disregard for the health and safety of generations of Michigan State University ("MSU") student-athletes. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief.

**INTRODUCTION**

1.     Before Richard Proebstle passed away, his daily existence had become a struggle to exert control over his own mind. Though loved by his family and recognized as a competitive and hardworking man, Mr. Proebstle's mental state had sharply deteriorated, so much so that his memory was weak; he struggled to follow simple directions; and he was unable to take care of

1

himself.

2.      Things had not always been this way for Mr. Proebstle. When he entered MSU, he was an energetic young man, eager to enjoy school and play football.

3.      However, through years of practices and gameplay in college, Mr. Proebstle was hit over and over again, repeatedly taking crushing blows to the head that were dismissed as merely getting his "bell rung" and a natural part of the game. Eventually Mr. Proebstle was hit so hard that he was knocked unconscious, sent to the hospital, and forced to walk away from the game of football.

4.      These blows would later manifest themselves in the form of dementia, Parkinson's disease, Alzheimer's disease, and CTE, carrying with them a host of painful physical and psychological symptoms that Mr. Proebstle struggled with through his last days.

5.      For decades, Defendant NCAA knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but recklessly disregarded this information to protect the very profitable business of "amateur" college football.

6.      While in school, Richard Proebstle and MSU players like him were under Defendant's care. Unfortunately, Defendant did not care about the off-field consequences that would haunt Mr. Proebstle and those like him for the rest of their lives.

7.      Despite knowing for decades of a vast body of scientific research describing the danger of TBIs and other harmful, repeated blows to the head—like those Richard Proebstle experienced—Defendant failed to implement adequate procedures to protect Richard Proebstle and other MSU football players from the long-term dangers associated with them. Defendant did so knowingly and for profit.

8.      As a direct result of Defendant's acts and omissions, Richard Proebstle and countless former MSU football players like him suffered severe neurological and cognitive damage, and ultimately became incapacitated and/or died. As such, Plaintiff brings this Class Action Complaint in order to vindicate Richard Proebstle's and those players' rights, and hold the NCAA accountable.

## PARTIES

9.      Plaintiff Michael Proebstle brings this action on behalf of the Estate of Richard J. Proebstle and all others similarly situated. On February 22, 2019, Plaintiff Michael Proebstle was appointed Personal Representative of the Estate of Richard J. Proebstle by the Wabash County Circuit Court. (*See* Letters of Administration, attached hereto as Exhibit A.) Plaintiff Michael Proebstle is a citizen of the State of Indiana, and Richard Proebstle was a citizen of the State of Indiana when he died.

10.      Defendant National Collegiate Athletic Association ("Defendant" or "NCAA") is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Marion County, Indiana 46206. The NCAA is not organized under the laws of any State but is registered as a tax-exempt organization with the Internal Revenue Service. Defendant NCAA is an unincorporated organization. Defendant NCAA conducts business throughout this County, the State of Indiana, and the United States.

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Classes, which both consists of at least 100 members, is a citizen of a different state than Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection

apply to this action.

12.    This Court has personal jurisdiction over Defendant NCAA because it conducts significant business in this District, including establishing consumer and business contracts here, and because it maintains its principal place of business in this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred and/or emanated from this District, and because Defendant NCAA resides here.

## FACTUAL BACKGROUND

### I.    Defendant Had A Duty To Protect Student-Athletes, Including Richard Proebstle.

14.    The NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including the football program at MSU. According to the NCAA, more than 1,200 schools, conferences and affiliate organizations collectively invest in improving the experiences of athletes—on the field, in the classroom, and in life.

15.    The NCAA brings in more than $750 million in revenue each year and is the most significant college sports-governing body in the United States.

16.    The MSU football program has a strong following that generates millions of dollars per year for the school. Given its significant following and numerous on-field successes, the MSU football team attracts high-end talent from high schools across the country. Many MSU players have been drafted to play professional football in the National Football League.

17.    The NCAA plays a significant role in governing and regulating the MSU football program and owes a duty of care to safeguarding the well-being of its student-athletes.

18.    In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic

Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[1] The IAAUS was specifically formed for this purpose because, at the turn of the twentieth century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the NCAA was established.[2]

19.     As such, the genesis of the NCAA was for a singular goal: "to keep college athletes safe."[3]

20.     The overarching principles of the NCAA, including its purported commitment to safeguarding its athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and athletes. The NCAA Constitution states:

> The purposes of this Association are:
>
> (a)  To initiate, stimulate and improve intercollegiate athletics programs for athletes;
>
> (b)  To uphold the principal of *institutional control* of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b) (emphasis added).

---

[1]     *Who We Are*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are (last visited May 2, 2019).

[2]     In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

[3]     *Well-Being*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/health-and-safety (last visited May 2, 2019).

21.    The NCAA Constitution also defines one of its "Fundamental Policies" as the requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

22.    Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)
>
> **2.2.3 Health and Safety.**
>
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

23.    To accomplish this purpose, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. Both NCAA member institutions, including schools like MSU, and NCAA conferences are obligated to abide by the NCAA's rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

24.     The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."[4]

25.     The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which NCAA athletes (including Richard Proebstle), MSU, and all other member institutions can rely for guidance on player-safety issues.

26.     Richard Proebstle and MSU football players like him relied upon the NCAA's authority and guidance to protect his health and safety by treating and preventing head-related injuries, including the effects of those head injuries later on in his life.

27.     As compared to Richard Proebstle and other MSU football players, the NCAA was in a superior position to know of and mitigate the risks of him sustaining concussions and other head injuries of all kinds while playing football at MSU. It failed to do so.

## II.     Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.

28.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions and TBIs, with a heightened risk of long-term injuries and impacts, including—but not limited to—memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, and CTE.

29.     Such violent impacts to the head are a one-way street for those who experience

---

[4]     John T. Parsons, *2014-15 NCAA Sports Med. Handbook*, Nat'l Collegiate Athletic Ass'n (Aug. 2014), *available at* https://bit.ly/2QD5DUx.

them. As Jonathan J. Russin—Assistant Surgical Director at the USC Neurorestoration Center at the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and one's "best bet is to avoid concussions altogether."[5]

30.    To better understand the results of these studies, a brief introduction to concussions in football follows.

A.    <u>An Overview of Concussions in Football</u>.

31.    A TBI is an injury to the brain that comes as the result of the application of either external physical force or rapid acceleration and deceleration forces, which disrupts brain function in a manner that causes impairments in cognitive and/or physical function.

32.    A concussion is a TBI initiated by an impact to the head, which causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

33.    The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head, but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

34.    Concussions typically occur when linear and rotational accelerations impact the brain through either direct impact to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10 Gs. This is slightly more force than a fighter pilot receives from

---

[5]    Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck Med. of USC, https://bit.ly/2MzSkkC (last visited May 2, 2019).

performing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

35.    Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100 [Gs]: in effect, the player [who sustained two hits above 80 Gs] had two car accidents that morning."[6]

i.    *Concussion Symptoms*.

36.    When a collegiate athlete suffers a severe impact to the head, he may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;
- memory loss;
- nausea or vomiting;
- headaches;
- blurred vision and sensitivity to light;
- slurred speech or saying things that do not make sense;
- difficulty concentrating, thinking, or making decisions;
- difficulty with coordination or balance;
- feeling anxious or irritable for no apparent reason; and
- feeling overly tired.

37.    A collegiate athlete may not recognize the signs and/or symptoms of a concussion,

---

[6]    Malcolm Gladwell, *Offensive Play*, The New Yorker (October 19, 2009) http://www.newyorker.com/magazine/2009/10/19/offensive-play.

and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

ii.    *Post-Concussion Treatment*.

38.    After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury. Even after the immediate effects have worn off, a person who has suffered a concussion is four to six times more likely to receive another concussion than a person who has been concussion-free.

39.    The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

40.    Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months, and sometimes can even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

41.    Still, many people think of concussions as short-term, temporary injuries. However, decades of scientific research demonstrate the effects of concussions are anything but temporary.

B.    Studies Confirm the Dangers and Long-Term Effects of Concussions.

42.    Two of the leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions,

including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called the tau protein.

43.    Between 2002 and 2007, Dr. Bennett Omalu of the Brain Injury Research Institute examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelczyk, and Damien Nash. Waters killed himself; Nash died unexpectedly at the age of 24; Webster, homeless and cognitively impaired, died of heart failure; and Strzelczyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristics of CTE—a progressive, degenerative disease of the brain found in people with a history of repetitive brain trauma.

44.    In his early studies, Dr. Robert Cantu of the Boston University Center for the Study of Traumatic Encephalopathy found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. A recent update to these studies found CTE in a staggering 110 of 111 (99%) former NFL players and 48 of 53 former college players (91%).[7]

45.    These more recent studies were neither aberrations nor surprises but confirmations of what was already known or readily apparent from the existing medical literature.

46.    Studies like these, which establish the devastating dangers related to TBIs, date back to the early twentieth century. For example, in an article in the 1905 multi-volume medical text *A System of Medicine*, surgeon Sir William Bennett noted that the dangers from TBIs can arise just as easily when "no loss of consciousness occurs at all," and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given

---

[7]    Jesse Mez, MD, MS, *et al.*, *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football*, 318 JAMA 4, 360–370 (2017).

their less severe appearance.[8] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be severe or slight."

47.    Some early articles from this period began to recognize the unique dangers presented by football, specifically. The editors of the *Journal of the American Medical Association* recognized the long-term risks of such head injuries very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football.[9] Similarly, the risks of concussion in football were discussed in a 1906 article by Dr. Edward Nichols, who observed that a concussed player might go through multiple plays before his teammates noticed his altered mental state.[10]

48.    Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs, connect it to contact sports (including football), and find that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

49.    For instance, in 1927, Drs. Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention."[11] Then, in 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the

---

[8]    Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, A Sys. of Med. Vol. 8 231-32 (2d ed. 1910).

[9]    Editors, *The Football Mortality*, 39 JAMA 1464 (1905).

[10]    Edward Nichols, *The Physical Aspect of American Football*, 154 Boston Med. & Surgical J.1 (1906).

[11]    Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).

*Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head.[12]

50.    Countless studies were later conducted on boxers suffering chronic neurological symptoms as a result of repeated head injuries, and who displayed signs of dementia and impairment of motor functions.[13] As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline. However, in a chapter of a mid-twentieth century book on brain injuries, psychiatrists Karl M. Bowman and Abram Blau coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's mental state over time.[14]

51.    In 1936, Dr. Edward J. Carroll, Jr. wrote an article further recognizing "punch-drunk syndrome's" seriousness, stating that "no head blow is taken with impunity, and [] each knock-out causes definite and irreparable damage. If such trauma is repeated for a long enough period, it is inevitable that nerve cell insufficiency will develop ultimately, and the individual will become punch-drunk." He also noted that in addition to boxers, punch drunk had been recognized among football players.[15]

52.    The next year, the American Football Coaches Association published a report

---

[12]    Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

[13]    *See, e.g.*, E. Guttmann & C.E. Winterstein, *Disturbances of Consciousness After Head Injuries: Observations on Boxers*, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker, *Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists*, 15 J. of Neurology & Psychopathology 20 (July 1934); C.E. Winterstein, *Head Injuries Attributable to Boxing*, 2 Lancet 719 (Sept. 1937).

[14]    K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults and Children*, Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and Medico-Legal Aspects 309 (S. Brock, ed. 1940).

[15]    Edward J. Carroll, Jr., *Punch-Drunk*, 191 Am. J. Med. Sci. 706 (1936).

warning that players who suffer even "one concussion" should be removed from play.[16]

53.    In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion.[17]

54.    Starting in the late 1960's, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. John R. Hughes and D. Eugene Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").[18] Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

55.    In 1975, the Chief Medical Officer of the British Boxing Board of Control suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

> Irreversible brain damage caused by regular excessive punching can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as [Chronic] Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls while hunting or steep chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. **Anything which entails intermittent trauma to the head can cause it.**[19]

56.    Overall, countless studies—published in prominent medical journals such as the

---

[16]    Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion").

[17]    Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 New Eng. J. Med. 554, 555-56 (1952).

[18]    John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clin. Neurophysiology 183 (1968).

[19]    J.W. Graham, *Eight, Nine, Out! Fifty Years as Boxer's Doctor*, 56 (1975).

*Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*—warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions and head injuries. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;

- traumatic encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) in the brainstem;

- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

- immediate retrograde memory issues occur following concussions;

- head injuries require recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

57.    As a result of these studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

58.    By 1991, Dr. Robert Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries.

59.    In 2003, an NCAA concussion study concluded that football players who had

15

previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[20]

60.     Following these studies, in 2004, the National Athletic Trainers' Association published a position statement, recommending baseline cognitive and postural-stability testing, as well as return-to-play recommendations, including holding out athletes who exhibit symptoms of a suspected head injury.

61.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports, based on the most up-to-date research. These experts recommended that a player never be returned to play while symptomatic, and coined the phrase, "when in doubt, sit them out."

62.     Ultimately, while the NCAA knew of the harmful effects of TBIs (and other head injuries) on athletes for decades, it ignored these facts and failed to institute any meaningful methods of warning and/or protecting the athletes, including football players like Richard Proebstle. For the NCAA, the continued expansion and operation of college football was simply too profitable to put at risk.

---

[20]     Michael McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study, The Journal of the Am. Med. Ass'n* (November 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668.

### III. The NCAA Breached Its Duties to Student-Athletes, Including Richard Proebstle, by Ignoring the Dangers of Concussions and Failing to Implement Adequate Concussion Management Protocols.

63. For decades, the NCAA has been aware—through its own institutional knowledge, internal research, and current medical science, among other sources of information—that severe and/or repeated head impacts can lead to long-term brain injuries, including memory loss, dementia, depression, and CTE. Unfortunately, while the NCAA knew about the harmful and devastating effects of these sub-concussive and concussive injuries, it recklessly ignored these facts and failed to implement reasonable concussion management protocols to protect its athletes, including Richard Proebstle.

64. Such conduct stands in stark contrast to the NCAA's approach in comparable contexts. For instance, in 1960, the NCAA wholly discontinued its relationship with collegiate boxing following widespread criticism of the sport's dangers and a heightened organizational awareness of the long-term risks student boxers faced—including, but not limited to, developing "punch drunk syndrome." But as to college football, including MSU's football program, the NCAA continued to govern, support, and profit from the sport without disclosing what it knew to student-athletes, including Richard Proebstle.

65. Since at least 1933, the NCAA has known of the serious nature of concussions and other head injuries in college football, and even recognized the need for appropriate concussion management protocols. In its 1933 Sports Medicine Handbook—which it distributed to all member institutions—the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly.

66. The 1933 Sports Medicine Handbook then provided information for school and

college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them. It discussed head injuries, stating that they "are in a category by themselves and warrant special attention," as they "may be, and often are more severe in their immediate and remote consequences" than other injuries. Notably, the 1933 Sports Medicine Handbook recommended that, when concussion-related symptoms lasted longer than two days, players should "not be permitted to compete for 21 days or longer, if at all." It also stated, "[t]here is definitely a condition described as 'punch drunk' and often recurrent concussion cases in football and boxing demonstrate this," and that "[a]ny individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport."

67.     The NCAA recognizes that its Sports Medicine Handbook "may constitute some evidence of the legal standard of care," and has publicly recognized its duty and moral obligation to protect collegiate athletes. As NCAA President Mark Emmert testified to the Senate Commerce Committee in January 2014, "I will unequivocally state we have a clear moral obligation to make sure we do everything we can to protect and support student-athletes."

68.     Indeed, in the September 1968 issue of NCAA News, the NCAA published an article entitled *Dangers of Grid Head Injuries Cited by Safeguards Committee.* In the article, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport issued a statement on the dangers of repeated head injuries in football, stating:

> [T]hose individuals who have been rendered unconscious, even momentarily, in a given game should never be allowed to play again in the same game and not allowed to return to contact until all symptoms have cleared up entirely and he has been checked by a competent medical authority.

69.     Rather than inform Richard Proebstle and other MSU athletes of these risks or implement protocols to protect and safeguard him from head injuries (as the NCAA promised to

do through the NCAA Constitution, among other things), the NCAA failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

70.     Instead, in complete disregard of the vast body of known scientific evidence and the resources and authority that it possessed, the NCAA failed prior to 2010 to, amongst other things, do any of the following:

- implement adequate guidelines or rules to prevent repeated concussions, and failed to educate players, including Richard Proebstle, about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce adequate return to play procedures or take action to educate athletes, including Richard Proebstle, about the risks of repetitive head injuries;

- conduct a football program that proactively encouraged Richard Proebstle and other MSU football players to avoid head injuries, instead compelling players to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms; and

- contact football players, including Richard Proebstle, after they left MSU to inform them that they had been exposed to an increased risk of long-term brain damage by the sub-concussive and concussive blows sustained while playing football for MSU.

71.     In April 2010, under mounting public pressure, the NCAA made changes to its concussion treatment protocols, this time enacting a new policy that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

72.     Under that new policy, which became effective in August 2010, member schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management

of concussions."

73.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

74.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

75.     This policy is flawed though: due to the very nature of concussions, athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. For example, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly, despite their very elementary nature. Following logically on that, a player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as the NCAA and MSU, to identify concussive injuries in real-time and take appropriate remedial actions. The NCAA has stood in the role of guardian, tasked with making decisions in Richard Proebstle's best interests. The NCAA failed to fulfill that role and instead acted in its own self-interest, to the detriment of Richard Proebstle.

76.     In the end, the NCAA implemented these (still deficient) policies far too late for Richard Proebstle and other MSU football players.

## FACTS SPECIFIC TO RICHARD PROEBSTLE

77.    Richard Proebstle played football at MSU from 1960 to 1964, as a quarterback. During his playing career, Mr. Proebstle participated in dozens of football games, as well as hundreds of practices and scrimmages.

78.    While playing football at MSU, Mr. Proebstle suffered from numerous concussions, as well as countless sub-concussive hits as a part of routine practice and game play.

79.    During a practice scrimmage his senior season, Mr. Proebstle suffered a concussive blow so severe that he was knocked unconscious and sent to the hospital. That concussion ended his football career.

80.    Immediately after college, Mr. Proebstle's mental and physical health appeared to remain relatively normal, as he began his career in business. During his working career, he received numerous sales awards at IBM and NML, and became president and owner of Mid-States Equipment where he received significant dealer awards.

81.    But things soon began to change. In or around 2003, Mr. Proebstle's mental health began to decline—his memory worsened, and he began exhibiting Parkinsonian tendencies and symptoms of Alzheimer's disease.

82.    From that point, Mr. Proebstle's mental and physical health quickly deteriorated, prompting him to seek treatment from a variety of neurologists and other physicians, with whom he had to have very frequent appointments, multiple examinations, including several MRIs and PET scans of his brain, and numerous neuropsychological evaluations.

83.    During these visits, Mr. Proebstle repeatedly reported being depressed and anxious, and had increased difficulty with memory and concentration, had difficulty sleeping, and

experienced tremors, as well as having increased problems with his motor functions, cognition, speech, and language.

84.     In September 2010, Mr. Proebstle was diagnosed with dementia, and shortly after, was placed in a care facility for his own safety, where he could receive proper professional care. In 2011, he was diagnosed with Parkinson's dementia.

85.     Unfortunately, Mr. Proebstle's mental and physical health continued to deteriorate up until his last days: he was very forgetful; he had a delayed reaction during conversations, and eventually lost all ability to verbally communicate; he was unable to feed, clothe, bathe, or otherwise take care of himself; he had difficulty following very simple commands; and he became combative with those around him. By the end of 2011, Mr. Proebstle was completely confined to a bed.

86.     On May 17, 2012, Richard Proebstle passed away at the age of 69.

87.     Believing that Mr. Proebstle had developed CTE, his brain was sent to the Boston University School of Medicine Chronic Traumatic Encephalopathy Center to be examined.

88.     In May 2012, Boston University confirmed that Richard Proebstle had, in fact, suffered from stage IV CTE and stage VI Alzheimer's disease. Indeed, by the time of his death, his brain had atrophied by nearly 25 percent.

89.     Since the inception of MSU's football program, through at least 2010, there were no adequate concussion management protocols or policies in place to address and treat the head injuries sustained by Mr. Proebstle and others during practice and in games.

90.     In fact, although Mr. Proebstle sustained repetitive serious blows to the head in practices and games for the NCAA's profit, the NCAA failed to adopt or implement adequate

concussion management safety protocols or return to play guidelines during his time on MSU's football team.

91.    Up until the concussive hit that ended his football career, whenever Mr. Proebstle experienced a concussive or sub-concussive hit, he would quickly be returned to the field of play or only be taken out of play or practice for an inadequate period of time—if he was taken out of play at all.

92.    Likewise, each time Mr. Proebstle suffered a concussive or sub-concussive hit, he was deprived by the NCAA of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate risks associated with TBIs and other blows to the head.

93.    As a result of these injuries, during his adult life Richard Proebstle suffered from issues including, but not limited to, short-term memory loss, depression, anxiety, loss of concentration, loss of impulse control, loss of executive functioning, impaired judgment, irritability, emotional instability, speech and language difficulties, sleeping difficulties, motor impairment, dementia, Parkinson's disease, Alzheimer's disease, and CTE. Richard Proebstle ultimately died as a direct consequence of the injuries he received playing football (and the NCAA's failure to adequately police the sport).

## CLASS ACTION ALLEGATIONS

94.    **Class Definitions**: Plaintiff Michael Proebstle brings this action on behalf of the Estate of Richard Proebstle, and on behalf of two classes defined as follows:

> **Deceased or Legally Incapacitated Class**: All individuals who participated in MSU's varsity football program between 1952 and 2010, *and*, all legally authorized representatives of such persons to the extent they are deceased or otherwise incapacitated.

> **Derivative Class**: Spouses, parents, children who are dependents, or any other persons who properly under applicable law assert the right to sue independently or derivatively by reason of their relationship with MSU varsity football players who are included, or whose

representatives are included, in the Deceased or Legally Incapacitated Class.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

95.    **Numerosity**: The exact number of members of the Classes is not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. Upon information and belief, hundreds of individuals fall into the definition of the Classes.

96.    **Commonality**: There are many questions of law and fact common to Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members. Common questions for the Classes include, but are not limited to, the following:

(a)    Whether Defendant had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b)    Whether Defendant had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related brain injuries;

(c)    Whether Defendant's conduct as alleged herein constitutes a breach of duty;

(d)    Whether Defendant's conduct as alleged herein constitutes negligence;

(e)    Whether Defendant's conduct as alleged herein constitutes breach of contract; and

(f)    Whether Plaintiff and the Classes are entitled to equitable relief,

including actual and compensatory damages, and other injunctive relief.

97.    **Typicality**: Plaintiff's claims are typical of those of members of the Classes, as Plaintiff and other members sustained injuries arising out of the same wrongful conduct of Defendant.

98.    **Adequate Representation**: Plaintiff will fairly and adequately represent the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

99.    **Predominance and Superiority**: Classes proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION
## NEGLIGENCE – WRONGFUL DEATH
## (<u>On Behalf of Plaintiff and the Derivative Class</u>)

100.    Plaintiff incorporates by reference the foregoing allegations.

101.    From its inception and by virtue of its role as the governing body of college athletics, the NCAA has historically assumed a duty to protect the health and safety of all athletes at member institutions, including Richard Proebstle. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including

promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its athletes, including Richard Proebstle.

102.    The duties of the NCAA included specific obligations to supervise, regulate, and monitor the rules of the MSU football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to MSU football players, including Richard Proebstle.

103.    The NCAA had a duty to educate MSU football players, including Richard Proebstle, on the proper ways to evaluate and treat head injuries during and after football games and practices, including repetitive concussive and sub-concussive injuries. The NCAA's duties further included a duty to warn its athletes, including Richard Proebstle, of the dangers of concussive and sub-concussive injuries and of the risks associated with football before, during, and after they played college football, and as additional information came to light.

104.    The NCAA had a duty not to conceal material information from MSU football players, including Richard Proebstle.

105.    The NCAA breached its duties owed to MSU student-athletes, including Richard Proebstle, by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in the locker room, and in the weeks and months after he sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings included, but are not limited to:

    (a)    failing to adequately recognize and monitor concussive and sub-concussive injury during football practices and games;

    (b)    failing to adequately inform student football players of the dangers of concussive and sub-concussive injuries;

    (c)    failing to adequately design and implement return to play

26

regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

(d)    failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

(e)    failing to adequately inform the families of student football players who sustained concussive and/or sub-concussive injuries; and

(f)    failing to adequately provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time student football players, including Richard Proebstle, left MSU.

106.    The NCAA breached its duties to student football players, including Richard Proebstle, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma it possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Richard Proebstle.

107.    As a football player at MSU, Richard Proebstle and those like him relied upon the guidance, expertise, and instruction of the NCAA in understanding the risks associated with serious and life-altering concussive and sub-concussive hits in football.

108.    At all times, the NCAA had superior knowledge of material information regarding the effects of repeated head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to MSU football players, including Richard Proebstle, the NCAA knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while attending MSU and thereafter.

109.    Repetitive head impacts during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

110.    In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, Parkinson's disease, and other similar cognitive-impairing conditions.

111.    MSU student-athletes, including Richard Proebstle, experienced repetitive head impacts during their college football careers, which significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other, similar cognitive-impairing conditions.

112.    The repetitive head accelerations and hits to which student-athletes, including Richard Proebstle, were exposed presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence and concealment, the risk of harm to these student-athletes, including Richard Proebstle, would have been materially decreased, and they would not have sustained debilitating mental health issues and, as in Richard Proebstle's case, died.

113.    As a direct and proximate result of Defendant's negligence, Richard Proebstle experienced repetitive concussive and sub-concussive impacts during his college football career, which significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, Parkinson's disease, and other, similar

cognitive-impairing conditions. And Richard Proebstle did, in fact, develop an array of neurocognitive deficiencies, including but not limited to short-term memory loss, depression, anxiety, loss of concentration, loss of impulse control, loss of executive functioning, impaired judgment, emotional instability, irritability, speech and language difficulties, sleeping difficulties, motor impairment, dementia, Parkinson's disease, Alzheimer's disease, and CTE.

114. Thus, as a direct and proximate result of the NCAA's negligence, Richard Proebstle sustained serious injuries and died.

115. As a direct and proximate result of the NCAA's negligence, Plaintiff has lost care, financial support, training, advice, comfort, companionship, moral support, and protection, among other pecuniary and nonpecuniary losses.

116. As a result of its negligence, the NCAA is liable to Plaintiff and the Derivative Class for the full measure of damages and other relief allowed under applicable law for causing the death of Richard Proebstle and MSU football players like him, as well as interest, reasonable attorneys' fees, expenses, and costs.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE – SURVIVAL ACTION**
**(ON BEHALF OF PLAINTIFF AND THE DECEASED OR**
**LEGALLY INCAPACITATED CLASS)**

117. Plaintiff incorporates by reference the foregoing allegations.

118. From its inception and by virtue of its role as the governing body of college athletics, the NCAA has historically assumed a duty to protect the health and safety of all athletes at member institutions, including Richard Proebstle. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-

to-date guidance and regulations to minimize the risk of injury to its athletes.

119.    The duties of the NCAA included specific obligations to supervise, regulate, and monitor the rules of the MSU football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to MSU football players, including Richard Proebstle.

120.    The NCAA had a duty to educate MSU football players on the proper ways to evaluate and treat head injuries during and after football games and practices. The NCAA's duties further included a duty to warn its athletes of the dangers of head impacts and of the risks associated with football before, during, and after they played college football, and as additional information came to light.

121.    The NCAA had a duty not to conceal material information from MSU football players, including Richard Proebstle.

122.    The NCAA breached its duties owed to MSU student-athletes, including Richard Proebstle, by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of head injuries on the playing field, in the locker room, and in the weeks and months after they sustained head injuries, as well as providing treatment for the latent effects of head impacts of all types. These failings included, but are not limited to:

    (a)    failing to adequately recognize and monitor head impacts during football practices and games;

    (b)    failing to adequately inform student football players of the dangers of head impacts and injuries;

    (c)    failing to adequately design and implement return to play regulations for student football players who sustained head impacts and/or were suspected of sustaining such injuries;

    (d)    failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) head injuries;

     (e)    failing to adequately inform the families of student football players who sustained head injuries; and

     (f)    failing to adequately provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of head injuries, after the time student football players, including Richard Proebstle, left MSU.

123.    The NCAA breached its duties to student football players, including Richard Proebstle, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of head injuries and impacts; and (c) the proper ways to evaluate, treat, and avoid head injuries to football players, including Richard Proebstle.

124.    As a football player at MSU, Richard Proebstle and those like him relied upon the guidance, expertise, and instruction of the NCAA in understanding the risks associated with head impacts and injuries in football.

125.    At all times, the NCAA had superior knowledge of material information regarding the effects of repeated head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to MSU football players, including Richard Proebstle, the NCAA knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while attending MSU and thereafter.

126.    Repetitive head impacts and injuries during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's

encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

127.    In addition, repetitive head impacts can significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

128.    Student-athletes, including Richard Proebstle, experienced repetitive head impacts during their college football careers, which significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other, similar cognitive-impairing conditions.

129.    The repetitive head accelerations and hits to which MSU student-athletes, including Richard Proebstle, were exposed presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence and concealment, the risk of harm to these student-athletes, including Richard Proebstle, would have been materially decreased, and they would not have developed debilitating physical and mental health issues prior to their deaths.

130.    As a direct and proximate result of the NCAA's negligence, prior to the time of their deaths Richard Proebstle and the Deceased or Legally Incapacitated Class incurred economic and non-economic damages in the form of pain and suffering, permanent brain damage, medical costs, health care, home care expenses, other out of pocket expenses, lost time, lost future earnings, the and other damages.

131.    As a result, Defendant was the direct and proximate cause of Richard Proebstle's and the Deceased or Legally Incapacitated Class's injuries, and is liable to Plaintiff and the Deceased or Legally Incapacitated Class for the full measure of damages allowed under applicable law, as well as interest, reasonable attorneys' fees, expenses, and costs.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS CONTRACT – SURVIVAL ACTION
### (On Behalf of Plaintiff and the Deceased or Legally Incapacitated Class)

132.    Plaintiff incorporates by reference the foregoing allegations.

133.    As a football player at MSU, an institution governed by the NCAA, Richard Proebstle and other MSU football players were required to, and did, enter into contracts with the NCAA as a prerequisite to sports participation. The contract required Richard Proebstle and other MSU football players to complete a form affirming that they had read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that they agreed to abide by Division Bylaws.

134.    In exchange for these student-athletes' agreements, the NCAA promised to perform certain services and functions, including, amongst other things:

(a)    conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational wellbeing of NCAA athletes;

(b)    requiring that each member institution protect the health of, and provide a safe environment for, each of its participating athletes; and

(c)    requiring that each member institution establish and maintain an environment in which the NCAA athletes' activities are conducted as an integral part of the athletes' educational experience.

135.    By signing and agreeing to abide by NCAA rules and regulations, and thereafter participating in NCAA-sanctioned sports programs in accordance with said rules and regulations, Richard Proebstle and other MSU football players fulfilled their contractual obligations to the NCAA.

136.    As described in the foregoing allegations, the NCAA breached its contractual

agreement by failing to ensure Richard Proebstle and other MSU student-athletes were provided a safe environment in which to participate in collegiate football. The NCAA further breached its contractual agreement by concealing and/or failing to properly educate and warn Richard Proebstle and other MSU football players about the symptoms and long-term risks of concussions and repeated sub-concussive blows to the head.

137. Richard Proebstle and other MSU football players entered into written agreements with the NCAA in which they committed to play football at MSU, to attend MSU as students, and to comply with all codes of conduct and obligations as both football players and students at MSU.

138. Richard Proebstle and other MSU football players fulfilled their contractual obligations to the NCAA.

139. The NCAA's contractual breaches caused Richard Proebstle to suffer injuries and damages in the form of, *inter alia*, past, ongoing, and future medical expenses, lost time, lost earnings, and other damages, including death. Further, the Deceased or Legally Incapacitated Class members will likely incur future damages caused by the NCAA's breach of contract.

140. As a result of its misconduct and attendant breach of contract, Defendant is liable to Plaintiff and the Deceased or Legally Incapacitated Class for the full measure of damages and other relief allowed under applicable law.

**FOURTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT – SURVIVAL ACTION**
**(On Behalf of Plaintiff and the Deceased or Legally Incapacitated Class)**

141. Plaintiff incorporates by reference the foregoing allegations.

142. The NCAA has long understood that repetitive head impacts sustained while playing football created a risk of harm to student-athletes that was similar or identical to the risk boxers faced by participating in boxing practices and matches.

143. The NCAA was aware of and understood the significance of the published medical

literature described herein, which detailed the serious risk of short- and long-term brain injury and disease associated with repetitive head impacts, including those which Richard Proebstle and other MSU football players were exposed.

144.    The NCAA knowingly concealed these risks from Richard Proebstle and other MSU football players considering whether or not to participate in an NCAA football program.

145.    By concealing these highly material facts, the NCAA intended to induce a false belief in Richard Proebstle and MSU football players like him about the short- and long-term risks of repetitive head impacts in football. As an entity that voluntarily took on the role of governing the sport of football in colleges across the country (including MSU), and was created and perpetuated specifically to protect player safety, the NCAA had a duty to speak about these issues—instead, it remained silent. The NCAA's intent in doing so was to induce Richard Proebstle and other MSU football players to continue playing NCAA football, even after sustaining one or more concussions or sub-concussive hits and even when those concussive and sub-concussive injuries required additional time to heal.

146.    Richard Proebstle and other MSU football players could not have reasonably been expected to know or discover the truth about the risks associated with concussive and sub-concussive blows to the head, or was misled from obtaining such truthful information. Richard Proebstle was under the care and treatment of the NCAA, and justifiably relied on the NCAA's silence as representing facts that did not exist.

147.    Given the NCAA's superior and unique vantage point, Richard Proebstle and other MSU football players reasonably looked to the NCAA for guidance on head impacts—and concussions, in particular—as well as the later-in-life consequences of receiving repetitive head impacts during football games and practices at MSU.

148.    The concealed information was such that Richard Proebstle and WSU football players like him would have acted differently had they been aware of the material facts known to, and concealed by, the NCAA. Had they known the truth, they would have at least taken additional precautions while playing football.

149.    The NCAA failed to act reasonably in light of its omission, including by failing to develop and implement adequate guidelines and rules regarding return-to-play criteria, and other safety procedures. The NCAA's inaction and concealment increased the risk of long-term injury and illness in Richard Proebstle—and indeed, did result in him suffering from long-term brain injuries and disease, including but not limited to a Parkinsonian disorder, Alzheimer's disease, and CTE.

150.    As a direct and proximate result of Defendant's knowing concealment and/or willful blindness, Richard Proebstle and MSU players like him suffered substantial injuries.

151.    As a direct result of the NCAA's failure to reveal pertinent information, Richard Proebstle incurred economic and non-economic damages in the form of pain and suffering, permanent brain damage, past medical costs, health care, home care expenses, other out of pocket expenses, lost time, lost earnings, and the loss of enjoyment of life.

152.    As a result, Defendant is liable to Plaintiff and the Deceased or Legally Incapacitated Class for the full measure of damages and other relief allowed under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Proebstle, as Personal Representative of the Estate of Richard J. Proebstle and on behalf of the Classes, respectfully requests that the Court enter an Order providing for the following relief:

A.    Certify this case as a class action on behalf of the Classes defined above, appoint

Plaintiff as representative of the Classes, and appoint his counsel as Class Counsel:

     B.    Declare that Defendant's actions, as set out above, constitute negligence, breach of contract, and fraudulent concealment, and that Defendant's actions caused the wrongful death of Richard Proebstle and similarly situated members of the Derivative Class;

     C.    Award all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and caused by Defendant's conduct, including without limitation damages for damages for past medical expenses, other out of pocket expenses, lost time and interest, lost earnings, death, and other damages;

     D.    Award Plaintiff reasonable litigation expenses and attorneys' fees;

     E.    Award Plaintiff pre- and post-judgment interest, to the extent allowable;

     F.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff; and

     G.    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**MICHAEL PROEBSTLE**, as Personal
Representative of the Estate Richard Proebstle,
individually and on behalf of all similarly situated
individuals,

Dated: May 2, 2019         By: /s/ Jeff Raizner _____
                  *An Attorney for Plaintiff*

Jeff Raizner
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9099

Fax: 713.554.9098

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Putative Classes*

*Admission* pro hac vice *to be sought*